PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

       *Plaintiff-Appellee,*

v.

ARTURO CASTELLANOS,

       *Defendant-Appellant.*

No. 12-4108

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
N. Carlton Tilley, Jr., Senior District Judge.
(1:11-cr-00031-NCT-5)

Argued: January 31, 2013

Decided: May 29, 2013

Before TRAXLER, Chief Judge, and AGEE and DAVIS,
Circuit Judges.

_____

Affirmed by published opinion. Judge Agee wrote the majority opinion, in which Chief Judge Traxler joined. Judge Davis wrote a dissenting opinion.

**COUNSEL**

**ARGUED:** Michael E. Archenbronn, Winston-Salem, North Carolina, for Appellant. Sandra Jane Hairston, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF**: Ripley Rand, United States Attorney, Greensboro, North Carolina, for Appellee.

---

**OPINION**

AGEE, Circuit Judge:

Arturo Castellanos conditionally pled guilty in the Middle District of North Carolina to conspiracy to distribute cocaine. His sole challenge on appeal is to the district court's denial of his motion to suppress the cocaine, which had been found in the gas tank of a Ford Explorer as the vehicle was being transported on a commercial car carrier. We agree with the government that Castellanos failed to prove he had a legitimate expectation of privacy in the vehicle, and we affirm the judgment of the district court.

I.

On September 20, 2010, Captain Kevin Roberts of the Reeves County, Texas, Sheriff's Department, was conducting a routine patrol at a truck stop near Pecos, Texas. He observed a Direct Auto Shippers ("DAS") commercial car carrier at a fuel filling station, and became suspicious that one of the vehicles being transported on the car carrier, a Ford Explorer (the "Explorer"), bore a dealership placard in lieu of a regular license plate.

Upon questioning the driver of the car carrier about the Explorer, Roberts was provided shipping documents identifying the owner of the vehicle as Wilmer Castenada. The docu-

ments also reflected a trip origin in California with a final destination for delivery of the vehicle in Greensboro, North Carolina. Roberts attempted to contact Castenada using the phone number provided to DAS, but received no answer. He then attempted to verify the origin and destination addresses provided to DAS, but the California address was not associated with anyone bearing Castenada's name, and the North Carolina address matched two unrelated businesses. When Roberts contacted those businesses, their representatives each stated they had never heard of Castenada and were not expecting delivery of a vehicle.

Unable to contact Castenada, Roberts asked the driver of the DAS car carrier for permission to search the Explorer. The driver consented, and Roberts opened the Explorer and began to search the interior of the vehicle. He immediately noticed "grass and stuff" in the utility area, which, in his view was inconsistent with the Explorer coming from a dealership. He also noticed the "strong odor of Bondo," a compound commonly used in the repair and after-market alteration of vehicles. (J.A. 38). Roberts observed fresh tool marks where the rear seats were anchored to the floor, indicating those had recently been removed or installed. When he pounded on the rear floorboard, Roberts noticed an inconsistency in the sound on the passenger side above the gas tank.

Roberts then inserted a fiber optic scope into the Explorer's gas tank in order to peer into its interior. When he did so, Roberts observed several blue bags floating in the tank. He then asked the car carrier driver if he (Roberts) could take custody of the Explorer. The driver consented and Roberts, with other officers, took possession of the Explorer and transported it to another location for further examination. When Roberts and other officers examined the Explorer in more detail, they found that the gas tank had been opened and resealed with Bondo, and recovered 23 kilogram-sized bricks of cocaine with a street value of approximately $3 million.

Subsequently, DAS informed Roberts that someone claiming to be Castenada had been calling DAS to inquire about the delivery of the Explorer. Using new contact information for Castenada received from DAS, Roberts called the telephone number claiming to be an employee of a wrecker service in Texas. Roberts falsely informed the individual claiming to be Castenada that the driver of the DAS carrier had been arrested and his cargo impounded so that Castenada would be required to travel to Texas in order to claim the Explorer. A few days later Roberts learned that someone, later identified as Arturo Castellanos, had arrived locally and was waiting for a ride to the wrecker service to claim the Explorer.

Police located and detained Castellanos, who had in his possession the title to the Explorer, the DAS tracking number for that vehicle, and a piece of paper bearing Roberts' phone number from the earlier calls. Castellanos waived his *Miranda*[1] rights, and told Roberts that he was in the process of purchasing the Explorer from Castenada, who lived in North Carolina. He then explained that Castenada advised him to go from Castellanos' home in California to Texas to retrieve the Explorer, then drive it to Castenada in North Carolina where Castellanos would pay Castenada for the vehicle. Castellanos would then drive the Explorer back to California. After Roberts expressed considerable skepticism at his story, Castellanos terminated the interview.

Police also seized two duffle bags that a co-conspirator (not party to this appeal) left at a local motel's front desk. Castellanos, who claimed to be traveling alone, denied that either of the bags belonged to him. When Roberts opened one of the bags, he found, in addition to other items, a contoured neck pillow. Feeling a foreign object inside the pillow, Roberts opened it and discovered a cellular telephone in a plastic bag. When Roberts turned the phone on, he found that the number

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

of the telephone matched the number provided by DAS that he had been using to contact Castenada.

Castellanos and other individuals not party to this appeal were later indicted in the Middle District of North Carolina on one count of conspiracy to distribute five kilograms or more of a mixture containing a detectable amount of cocaine hydrochloride, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 846(b)(1)(A).

Prior to trial, Castellanos moved to suppress the items contained in the duffle bag and the cocaine found in the gas tank. The government's evidence adduced at the suppression hearing consisted entirely of testimony from Roberts, who detailed the search and seizure of the vehicle and the subsequent investigation that lead to the arrest of Castellanos.

Notably, Castellanos did not introduce any evidence to show that he owned the Explorer at the time Roberts conducted the warrantless search or had permission to use the vehicle. Although Castellanos appeared in Texas with a title document to the Explorer, he did not put the title into evidence or otherwise attempt to demonstrate any ownership or possessory interest in the vehicle. Castellanos' out-of-court statements, as relayed by Roberts, made clear that Castellanos himself maintained that Castenada was a different person, insofar as he claimed the purchase of the Explorer from Castenada was an incomplete transaction. Castellanos made no showing that he and Castenada were one and the same person or that Castenada was his alias.

After hearing argument, the district court issued a short ruling from the bench. The court stated that

> I'm going to deny [Castellanos'] motion as to both the duffle bags, and with regard to the automobile, which had been given over to a common carrier with addresses which were ascertained to be false

addresses. There was no legitimate expectation of privacy at that point. The shipper's address was false. The person who was to receive it was a false address.

(J.A. 72.)

The court did not make any findings of fact.

Prior to trial, Castellanos entered into a conditional plea agreement with the government and pled guilty to the sole count of the indictment, conspiracy to distribute cocaine hydrochloride. Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Castellanos reserved the right to appeal the district court's adverse decision on his motion to suppress. Castellanos was sentenced to 120 months' imprisonment and noted a timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

The sole assignment of error raised by Castellanos on appeal is that the district court erred in denying his motion to suppress the evidence of the cocaine discovered in the gas tank of the Explorer.[2] The government rejoins, however, that as a threshold matter, Castellanos cannot challenge the search because he failed to show a reasonable expectation of privacy in the vehicle's gas tank. If the government is correct, that issue is dispositive on appeal so we address it first.

We review de novo the district court's legal conclusions on a motion to suppress. *See United States v. Cardwell*, 433 F.3d 378, 388 (4th Cir. 2005). Normally, we would review the dis-

---

[2]Castellanos does not challenge the district court's denial of his motion to suppress the contents of the duffle bags. Accordingly, any challenge to that ruling is waived. *See United States v. Hudson*, 673 F.3d 263, 268 (4th Cir. 2012) (issues not raised in opening brief are waived).

trict court's factual findings in the suppression context for clear error. *See id.* Here, however, the court made no findings of fact. "It is, of course, the better practice for the district court to make such findings, but where the district court fails to do so, we assume the district court construed the evidence in the light most favorable to the party who prevails on the suppression motion below," *id.*, in this case, the government.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. A government agent's search is unreasonable when it infringes on "an expectation of privacy that society is prepared to consider reasonable." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "In order to demonstrate a legitimate expectation of privacy, [Castellanos] must have a subjective expectation of privacy," *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010), and that subjective expectation of privacy must be "objectively reasonable; in other words, it must be an expectation that society is willing to recognize as reasonable," *United States v. Bullard*, 645 F.3d 237, 242 (4th Cir. 2011) (internal quotation marks omitted). The burden of showing a legitimate expectation of privacy in the area searched rests with the defendant. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

The government argues that Castellanos lacked any expectation of privacy in the Explorer because the record failed to establish that he actually owned the vehicle or established any legitimate possessory interest in it. In the absence of such evidence, the government argues, Castellanos is essentially seeking the protection of the Fourth Amendment vicariously and such a status is inadequate upon which to raise a Fourth Amendment claim.[3]

---

[3]We note at the outset that the concept of "standing" as it is used in the Fourth Amendment context is largely subsumed by substantive Fourth Amendment law, which views the concept through the lens of a reasonable expectation of privacy. Put another way, the Supreme Court has moved away from an independent doctrine of "Fourth Amendment standing." In

"The Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351 (1967). Accordingly, Fourth Amendment rights "may not be vicariously asserted." *United States v. Rumley*, 588 F.3d 202, 206, n.2 (4th Cir. 2009) (quoting *Rakas v. Illinois*, 439 U.S. 128 133-34 (1978)). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134 (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Conversely, "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman*, 394 U.S. at 171–72. The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the

---

*Rakas v. Illinois*, 439 U.S. 128, 139 (1978), the Court observed that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." The relevant inquiry, thus focused, is

> whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

*Id.* at 140. While in contexts outside those of the Fourth Amendment, the term "standing" might be used to describe the government's argument that Castellanos cannot successfully challenge the search of the Explorer, we recognize that we are ultimately asking whether Castellanos "*personally* has an expectation of privacy in the place searched, and [whether] his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (emphasis added). Accordingly, we analyze "standing" in the context of whether Castellanos had a reasonable expectation of privacy within the gas tank of the Explorer under the facts of this case.

protection . . . has a legitimate expectation of privacy in the invaded place." *Rakas*, 439 U.S. at 143.

For the reasons explained herein, we agree with the government and hold that Castellanos has failed to demonstrate by a preponderance of the evidence that, at the time of the search, the evidence showed that he had a legitimate expectation of privacy in the Explorer.[4]

When attempting to determine whether a defendant has a reasonable expectation of privacy in property that is held by another, we consider such factors as "whether that person claims an ownership or possessory interest in the property, and whether he has established a right or taken precautions to exclude others from the property." *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992). Here, Castellanos asserted to Roberts that he was purchasing the Explorer, but his claim is not substantiated in any way by the record. Castellanos did not enter the title of the Explorer into evidence, nor did he establish that he purchased the vehicle with a bill of sale, Division of Motor Vehicles registration, or anything else. And

---

[4]The dissent repeatedly faults the government and the district court for failing to call Castellanos at the suppression hearing to prove his standing (i.e., his reasonable expectation of privacy) in order to raise the objection to the search of the Explorer. *See post*, at 13-14, 30 n.16. But the dissent agrees with the undisputed proposition that proving standing was Castellanos' burden to bear. *See post* at 33 (citing *United States v. Stevenson*, 396 F.3d 538, 547 (4th Cir. 2005). Castellanos made no effort to prove his standing or rebut the government's argument that he had none. He was represented by able counsel, and it is not the duty of the court or the government to make Castellanos' reasonable expectation of privacy case for him. Indeed, as the dissent itself observes, the government's primary argument in opposition to the motion to suppress was that Castellanos lacked standing to challenge the search of the Explorer. *See post* at 14. Castellanos, through counsel, was on notice that his standing was disputed, and neither the government, nor the district court, was obligated to remind him of his burden. Moreover, the argument made by the dissent appears *sua sponte* for the first in the dissent, having never been presented by Castellanos in the trial court or on appeal.

there is no evidence that, if he purchased the Explorer at all, he did so prior to the search.

Parties other than owners may possess a reasonable expectation of privacy in the contents of a vehicle. *See, e.g.*, *United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945, 949 n.2 (2012) (observing that although the defendant was not the registered owner of the searched vehicle, he was the "exclusive driver" and the Court thus "[did] not consider the Fourth Amendment significance of Jones's status"). However, Castellanos offered no evidence that he had any such interest, though he bore the burden of proof. For example, Castellanos presented no evidence that Castenada (or anyone else) had granted him permission to use the vehicle or act as his agent with DAS, or any other right of any kind to the vehicle. This is not a case, like *Jones*, where the defendant has established an ownership, or even a possessory interest in the vehicle. *Cf. id.* (describing Jones' rights as similar to those of a bailee). Accordingly, this is not the type of case where a defendant has established such a close connection to the vehicle that is subject to search that he may claim a possessory interest in it.

Furthermore, although "[i]ndividuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names," *United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992), we note that Castellanos adduced no evidence at the suppression hearing demonstrating that the name "Wilmer Castenada" was simply an alias. Instead, Castellanos' position was that he and Castenada were two separate individuals engaged in a sale transaction as testified by Roberts. Indeed, Castellanos represented to the trial court that "there is no factual dispute here questioning the facts as rendered by Detective Roberts." (J.A. 67.) In the absence of evidence that Castenada was Castellanos' alter ego or a fictitious name, this case is more closely aligned with *United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984) (per curiam), a case in which we held that a defendant lacked a legitimate expecta-

tion of privacy in a package that was addressed to a third party.

In sum, the evidence heard by the district court at the suppression hearing failed to support a conclusion that Castellanos had anything more than a distantly attenuated connection to the Explorer. Castellanos bore the burden to show that he had a reasonable expectation of privacy, and he has not done so.[5] Having failed to carry his burden, Castellanos cannot challenge the warrantless search of the Explorer.

Finally, our good colleague in dissent makes a few points that we feel warrant a response. First, the dissent contends we "focus [our] attention on how the facts appeared to Captain Roberts at the time of the search," *post* at 34, thus misapplying the proper standard for determining whether Castellanos had a subjective expectation of privacy that is objectively reasonable. To the contrary, our analysis focuses on the facts in the record, rather than the facts as they may have appeared to Captain Roberts. The evidence in the record, of course, is based in large part on Roberts' testimony, which was not supplemented or controverted by any proffer from Castellanos. The Explorer's title, highly relevant to the question of whether Castellanos owned or had a sufficiently close connection to the Explorer, was never entered into evidence. Nor was there any evidence, other than his claim that, at some point he purchased the vehicle from Castenada, that Castellanos had an interest in the Explorer at the time it was searched.

---

[5]Because we conclude that Castellanos lacked a reasonable expectation of privacy in any part of the Explorer, we need not address any aspect of the search of the gas tank. Accordingly, we disagree with the dissent's assertion that we fashion a new rule of law that delivering personal effects to a common carrier undermines an otherwise objectively reasonable expectation of privacy in those effects. *See post* at 16 n.3. Castellanos does not lack standing because the Explorer was being transported by common carrier. He lacks standing because he failed to carry his burden to show that he had a constitutionally sufficient connection to the Explorer to demonstrate an objectively reasonable expectation of privacy.

In addition, the dissent argues that certain facts, known to the government and presented to the district court, establish that Wilmer Castenada was in fact merely an alias of Castellanos. Specifically, the dissent posits that although the address listed on the bill of lading was not associated with Castellanos personally, it was near a towing company where the Explorer *may* have been destined (Roberts' testimony was equivocal on that point), and that someone, who *may* have been Castellanos, had inquired within about the whereabouts of the Explorer.

We first observe that the theory upon which the dissent bases its conclusion appears for the first time in the dissenting opinion. Castellanos' opening brief on appeal is bereft of any analysis of the standing question, and despite the government's argument on brief that he lacked standing, Castellanos filed no brief in reply.[6] We therefore question the extent to which Castellanos can be the beneficiary of an argument he has never made.

Even granting Castellanos the benefit of the doubt, and assuming that the Explorer was in fact destined for the Montlieu Avenue towing company in Greensboro, and that Castellanos did in fact inquire therein about the Explorer's whereabouts, Castellanos is no closer to establishing that he has a sufficient connection to the Explorer to establish standing. Instead, the evidence shows at best that Castellanos asked about the Explorer at the place where it was to be delivered. It does not establish either that Castellanos was Castenada, or that, contrary to the bill of lading, Castellanos was the intended recipient. In sum, nothing in the dissent alters our conclusion that Castellanos' interest in the Explorer is too attenuated to demonstrate that any expectation of privacy he may have had in the Explorer's gas tank was reasonable.

---

[6]Indeed, although the dissent relies heavily on facts taken from the government's response to Castellanos' motion to suppress, the "Statement of Facts" contained in Castellanos' opening brief on appeal consists almost entirely of facts gleaned from Robert's testimony.

### III.

For all of the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

DAVIS, Circuit Judge, dissenting:

We are all familiar with the old legal saw:

> When the facts are against you, hammer the law.
> When the law is against you, hammer the facts.
> When both are against you, hammer the table and yell like hell.

*In re Fischer*, 131 B.R. 137, 138 (E. D. Mo. 1990).

The facts and the law cannot be ignored in this appeal. Nor can the pounding they take from the majority denude them of the power they possess.

The record before the district court established, by a preponderance of the evidence, that "Wilmer Castenada"[1] was the alias of Appellant, who had a possessory interest in, and an undisputed right to exercise dominion and control over, the Ford Explorer. Thus, contrary to the holding reached by the majority's abbreviated analysis, the proper result on the record before us is that the district court erred, procedurally and substantively, factually and legally, in reaching its conclusion that Appellant failed to establish an objectively reasonable, i.e., a "legitimate," expectation of privacy[2] sufficient

---

[1] The parties alternatively spell this name "Castenada" and "Castaneda." To be consistent with the majority opinion, this dissenting opinion uses the spelling Castenada, except when used in a direct quote.

[2] No one doubts that Appellant sufficiently manifested a subjective expectation of privacy; the only issue presented on appeal, and the only

to maintain his Fourth Amendment challenge to the warrant-less, nonconsensual search of the vehicle.

First, the district court never called on Appellant before or during the evidentiary hearing on the motion to suppress to "prove" his standing to challenge the search of the Explorer. *See infra* n.16. It did not do so, most likely, because the facts known to the government and the facts before the district court, prior to the suppression hearing, demonstrated that Appellant had an objectively reasonable expectation of privacy in the vehicle. Rather than call on Appellant at the outset to offer evidence of his standing (evidence that was already in the record), the district court proceeded directly to the merits of the suppression hearing by requiring the government to put on evidence. *See id.*

Second, like the district court, the government never called on Appellant to "prove" his standing to challenge the search of the Explorer. It did not do so because the prosecuting Assistant United States Attorney knew full well that Appellant, as a member of the narcotics conspiracy charged with seeing to the delivery from California to North Carolina of the cocaine hidden in the gas tank of the Explorer, had standing to challenge the search of the vehicle. Indeed, the record raises a serious question as to whether the prosecutor affirmatively misled the district court, through her selective presentation and advocacy of certain evidentiary facts, into making its erroneous determination of the legitimacy of Appellant's expectation of privacy. *See infra* n.6.

Third, as a matter of law, the government and the district court misapprehended the nature and the character of the evi-

issue discussed in this dissent, is the correctness of the district court's legal conclusion that Appellant lacked a "legitimate expectation of privacy at [the] point [when the Ford Explorer] had been given over to a common carrier with addresses which were ascertained to be false addresses." *See* J.A. 72.

dence necessary for Appellant to establish his standing to challenge the search of the Ford Explorer. As an initial matter, the court and the government erroneously believed that standing could only be established by *evidence formally introduced by Appellant*. That is not and has never been the law. *See infra* Part III.A. Furthermore, by obsessively and narrowly focusing on the state of mind of the law enforcement officer who conducted the challenged search, the government and the district court erroneously failed to apply the appropriate Fourth Amendment test for standing, *a test that hinges on objective reality at the time of the search, not on a law enforcement officer's subjective belief about the state of facts surrounding search and seizure issues*. *See infra* Part III.B. Viewed as it must be, in this and any case, *from an objective perspective as of the time of the search*, the issue of standing is easily and correctly resolved in favor of Appellant.

Fourth and finally, the district court's finding and conclusion that Appellant's use of a common carrier to ship narcotics hidden in a constitutionally protected effect, i.e., the gas tank of an automobile, coupled with the use of an alias, delegitimizes his expectation of privacy, constitutes clear factual error and manifest legal error. *See infra* Parts III.C & D. The evidence in this record shows that the district court committed clear error in finding that "[t]he shipper's address was false" (whatever that means) and that "[t]he person who was to receive [the Ford Explorer] was a false address [sic]." J.A. 72; *see infra* Part III.E. Indeed, directly contrary to the district court's finding, *the government effectively proved that its sole suppression hearing witness had erroneously concluded that the intended destination of the Ford Explorer was an address other than that identified on the bill of lading*.

At bottom, as a matter of law, Appellant did not relinquish, and society is not prepared to extinguish, the objective reasonableness of his undisputed subjective expectation of privacy

simply because he used an alias to conceal his involvement in a narcotics trafficking conspiracy.[3]

Respectfully, and for all of the reasons set forth herein, I dissent.

## I.

## A.

The majority opinion erroneously regards the relevant narrative of this case to commence on September 20, 2010, when Captain Kevin Roberts, of the Reeves County, Texas, Sheriff's Department, happened upon $3 million in cocaine hidden in the gas tank of a Ford Explorer he searched without a warrant and without valid consent. Rather, as the government advised the district court in its written opposition to the motion to suppress, the story begins sometime in 2009. As the government explained to the district court:

During in or about 2009, the Greensboro Resident

---

[3]By the same token, the district court and the majority commit legal error to the extent they fashion a new rule holding that delivering constitutionally protected personal effects to a common carrier is sufficient to undermine what is otherwise an objectively reasonable expectation of privacy. Although the Seventh Circuit has held, in the sole authority relied on by the district court in its summary denial of the motion to suppress here, that an individual relinquishes any privacy interest in a car when he turns it over to a shipper, *United States v. Crowder*, 588 F.3d 929, 934–35 (7th Cir. 2009), the court's reasoning in that case is deeply flawed and wholly unpersuasive. Not even the majority in this appeal accepts the Seventh Circuit's dubious reasoning; the majority does not even bother mentioning *Crowder*. No wonder. As explained *infra* in Part III.D, the mere fact of turning over an item to a common carrier does not extinguish one's objectively reasonable expectation of privacy in the item. If the majority intends, *sub silentio*, to fashion a contrary rule, then, in light of the irregular procedural course of events below, we should, at a minimum, vacate the judgment and remand this case for further proceedings on the motion to suppress.

Office of the Drug Enforcement Administration (GRO-DEA) initiated an investigation into the suspected drug trafficking activity of Juan Manuel Lopez. The investigation continued into 2010, and in August 2010, DEA agents obtained court authorization to install a global positioning satellite (GPS) tracking device on a burgundy Chevrolet Silverado pickup truck utilized by Juan Manuel Lopez.

J.A. at 21-22 (footnote omitted).[4] Thus, the government had

---

[4]This dissent's consideration of undisputed facts in the record of this case, set out in the government's written opposition to Appellant's motion to suppress, *see* J.A. 15-24, but outside the formal testimonial record of the hearing on the motion to suppress, is fully consonant with circuit precedent. In *United States v. Gray*, over a vigorous dissent, this Court relied on evidence presented *at sentencing* to shore up its affirmance of the district court's determination, made at the conclusion of an evidentiary hearing on a motion to suppress, that a defendant lacked an objectively reasonable expectation of privacy. 491 F.3d 138, 146–54 (4th Cir. 2007). We reasoned as follows, in pertinent part:

This court has recognized that when later proceedings confirm the correctness of the district court's findings, we can affirm a pre-trial suppression ruling based on such evidence. This ruling makes sense because all the facts pertinent to a suppression motion are not inevitably developed at a pre-trial hearing and both the trial court and the appellate court should not be precluded from taking note of a more comprehensive record supporting, as it does here, the district court's initial denial of the motion to suppress. In adopting a contrary approach, the dissent would create an artificial barrier against ascertainment of truth, lowering the curtain well before the end of the play.

*Id.* at 148 (citations omitted). It would make a mockery of the judiciary's assertion that it is an impartial seeker of truth to make this rule a one-way street by applying it solely to evidence that confirms a district court's denial of a motion to suppress, particularly on the threshold issue of standing.

Thus, this dissent relies on this Court's acknowledgement that the search for truth is enhanced by consideration of "a more comprehensive record" *supporting a district court's denial of a motion to suppress* "be-

been investigating the Greensboro narcotics trafficking operation of which Appellant was a part for more than a year prior to the serendipitous intervention of Captain Roberts in Texas on September 20, 2010. Indeed, as set forth above, for approximately a month prior to the events in Texas, the United States had been able to surveil one of the Greensboro, North Carolina, participants in the conspiracy through the use of GPS tracking technology. Through the use of that technology and other undisclosed investigative activity, the lead investigator, Agent Razik, came to anticipate the arrival of the Ford Explorer in Greensboro, and learned that Appellant, Arturo Castellanos, was using the alias "Wilmer Castenada" in his management, on behalf of the conspiracy, of the shipping and delivery of the Ford Explorer from California to North Carolina. J.A. 22–24, 45–48. In short, by the time of Captain Roberts's search of the Ford Explorer, the United States had at least one of the participants in the drug conspiracy charged in this case, of which Appellant was a part, well in its sights.

The government's proffer of evidence to the district court in its opposition to the motion to suppress continued as follows:

> On September 26, 2010, agents monitoring the GPS tracker followed Lopez's vehicle first to the

cause all the facts pertinent to a suppression motion are not inevitably developed at a pre-trial hearing." *Id.* Likewise, when "a more comprehensive record" is available *to demonstrate that the denial of a pre-trial ruling on standing was manifestly and clearly erroneous*, the search for truth is enhanced when we examine that record. This precept is especially true where, as here, the district court made no independent findings and the facts relied on are vouched for by the government in its written opposition to a defendant's motion to suppress and made a part of the joint appendix on appeal. *See* J.A. 15–29. *See also United States v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011) (noting that, in reviewing "rulings on motions to suppress," the appellate court is "not restricted to the evidence presented at the suppression hearing and instead consider[s] the whole record").

intersection of *Montlieu Avenue and Market Street in Greensboro, North Carolina.* Approximately 40 minutes later, he traveled to a restaurant near High Point Road and Meritt Drive in Greensboro. Surveillance agents saw Lopez leave the restaurant with two other men, *later identified as Auturo[5] CASTELLANOS* and Raul Hernandez. The three traveled together in Lopez's vehicle to Four Seasons Mall in Greensboro. *Surveillance footage from the Mall was obtained by DEA agents.*

*Because he was familiar with a business located in the Montlieu Avenue and Market Street area of Greensboro that receives shipped vehicles from DAS Auto Shippers, Special Agent Razik contacted the business and asked if anyone had been in on that day inquiring about a vehicle. The agent was advised that a Hispanic man had just been in making inquiry about a Ford Explorer. Agent Razik was advised that the same man had been in several times since September 24, 2010, asking about the vehicle. The man left telephone number 336-263-7145 as a contact number.*

*On September 27, 2010, the Montlieu Avenue business notified Agent Razik that the same Hispanic man had called again about the Ford Explorer and the man identified himself as "Wilmer." The man stated he was going to contact DAS directly. DAS Auto notified DEA later on September 27, 2010, that the Ford Explorer was seized in Texas on September 20, 2010.*

\* \* \*

---

[5]The parties have alternatively spelled Appellant's name "Arturo" and "Auturo." This dissenting opinion employs the spelling used on the docket of this appeal: Arturo.

On September 29, 2010, an employee at the Mont-
lieu Avenue business notified Agent Razik that the
Hispanic man had again come to the business inquir-
ing about the Ford Explorer. The employee advised
that the man had presented a tracking number and a
copy of the title for the Explorer. Agent Razik went
to the business and obtained a copy of the vehicle's
title. He also showed the two employees who spoke
with the Hispanic man a photograph that was taken
from the video footage at Four Seasons Mall on Sep-
tember 26, 2010. Both employees identified defen-
dant Auturo CASTELLANOS as the man who had
been to the business between September 24 and Sep-
tember 29, 2010, inquiring about the Ford Explorer.

J.A. at 22-24 (emphases added).

Thus, at the time of the suppression hearing in this case, on
July 6, 2011, the government knew full well that Appellant
had appeared in Greensboro, North Carolina, at the actual
*Montlieu Avenue* address where the Ford Explorer was to be
received by Appellant, who at all times was using his alias,
"Wilmer," and who was using a phone assigned the 336-263-
7145 number. In short, the government knew at the time of
the hearing on the motion to suppress that Appellant was
"Wilmer Castenada." The government also knew that during
the period between September 24 and 27, 2010, Appellant
was in Greensboro, North Carolina, not in California. And,
the government knew that Appellant was a member of a con-
spiracy that had been under investigation for narcotics traf-
ficking, with a California source, for approximately one year.

As the majority opinion recites, the disputed search of the
Ford Explorer on September 20, 2010, transpired in parallel
with the above described events in Greensboro. Captain Rob-
erts became suspicious while at a local truck stop when he
came upon a commercial car carrier which, on the top rack of
the trailer, was loaded with an "older model" Ford Explorer

that was being transported from California to Greensboro, North Carolina. J.A. 35. This was the vehicle that Appellant and his associates had been awaiting in Greensboro, and which Appellant regularly inquired about at the *Montlieu Avenue* address in Greensboro beginning no later than September 24, 2010. Roberts examined the shipping documents for the Ford Explorer; Wilmer Castenada, Appellant's alias, was listed as both the shipper and recipient. Regardless of whether Appellant (or some other member of the conspiracy) was the actual "shipper"—in the sense that he had been in California when the Ford Explorer had been loaded onto the DAS trailer—he was, unmistakably, the recipient in Greensboro.

Roberts attempted to contact Appellant at the phone number listed on the shipping documents, but there was no answer. Roberts then determined from an unspecified database that Appellant had no apparent connection to the California address. Roberts also determined (apparently using law enforcement or commercial databases not identified in the record) that two unidentified businesses could be associated with an address on Montlieu Avenue in Greensboro, North Carolina, where the Ford Explorer was to be delivered to "Wilmer Castenada." But when he called those businesses, no one at either was familiar with the name "Wilmer Castenada," and no one to whom Roberts spoke could confirm the anticipated delivery of a Ford Explorer.[6] It was upon these

(Text continued on page 23)

---

[6]Although the government did not elicit the address from Roberts during his testimony at the suppression hearing, the Montlieu Avenue address on the bill of lading (which itself is not in the record) was set forth in the government's written response to the motion to suppress. J.A. 16. The address also appeared in the "Factual Basis in Support of Guilty Plea" filed in the district court about two weeks after the hearing on the motion to suppress. Factual Basis Document 2, *United States v. Castellanos*, No. 1:11–cr–00031–NCT-5 (M.D.N.C. July 18, 2011) (hereinafter "Factual Basis"). *See supra* n.4 (discussing the propriety of considering supplementary material outside the formal testimonial record created at the hearing on the motion to suppress).

The address is 135 Montlieu Avenue, Greensboro, North Carolina, and two businesses share that address: Brickwood Builders and Dove Communications. Factual Basis 2. These are the businesses that Roberts telephoned on September 20, 2010, immediately before he conducted the warrantless, nonconsensual search of the Ford Explorer. *Id.* Of course, as he testified at the motion hearing on July 6, 2011, Roberts learned after speaking with Agent Razik on September 28, 2010, that, contrary to the address on the bill of lading, the correct address for the delivery of the Ford Explorer was *just across the street from 135 Montlieu Avenue, to wit, 136 Montlieu Avenue, near Market Street*, where there is a towing company known as Bobby's Friendly Towing. *See* J.A. 45 (Roberts's testimony about his conversation with Agent Razik); *id.* at 55 (Roberts's testimony that Castellanos, upon his arrest, had a piece of paper with information about "I believe a Bobby's Towing here in Greensboro where the vehicle was possibly destine [sic] to"); Better Business Bureau, BBB Business Review of Bobby's Friendly Towing & Storage, Inc., http://www.bbb.org/greensboro/business-reviews/towing-companies/bobbys-friendly-towing-and-storage-in-greensboro-nc-4004988 (last visited Apr. 16, 2013); GoogleMaps, http://maps.google.com (search "bobby's friendly towing greensboro north carolina" and zoom in five times) (last visited Apr. 16, 2013). *Cf. United States v. Foster*, 662 F.3d 291, 295 n.6 (4th Cir. 2011) (Agee, J.) ("We take judicial notice of a map of Lee County, Virginia . . . .").

I, for one, am disturbed that the government proceeded as it did. The government presented misleading testimony to the district court that likely had a grossly distorting effect on the hearing judge's comprehension of the evidence bearing on whether, at the time Roberts conducted his warrantless, nonconsensual search of the Ford Explorer, Appellant had such an ownership interest in, or the right (as a member of the narcotics conspiracy) to exercise such dominion and control over the Ford Explorer, as to sustain his objectively reasonable expectation of privacy against governmental intrusion.

If the judge had been told at the hearing that the bill of lading contained not a "false address" (as the judge ultimately found) but merely an erroneous address, off by one digit in the street number where the Explorer was to be delivered to Appellant, there is every reason to believe that the district court would have taken a closer look at the evidence and likely reached a contrary result than it did, given the alacrity with which the court reached its conclusion to deny the motion to suppress. *Cf. United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) ("The sup-

facts—and, apparently, these facts alone—that the district court erroneously concluded that Appellant had lacked a "legitimate expectation of privacy" at the point the Ford Explorer "had been given over to a common carrier with addresses which were ascertained to be false addresses." J.A. 72.

Of course, as set forth above, and as the government well knew at the time of the suppression hearing (even though Roberts did not know it at the time he searched the vehicle on September 20, 2010), Roberts was seriously mistaken in his attempt to investigate the destination of the Explorer. As the government's response to the motion to suppress made clear, "a business located in the Montlieu Avenue and Market Street area of Greensboro . . . receive[d] shipped vehicles from DAS Auto Shippers," and "a Hispanic man" had visited the business "several times since September 24, 2010," asking about "a Ford Explorer." J.A. 22–23.

Captain Roberts, having been stymied in his efforts to allay or confirm his suspicions regarding the Explorer, decided to roll the constitutional dice and worry about the consequences later.[7] That is, he proceeded to search the vehicle (1) without

pression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.") (affirming the district court's finding that a *Brady* violation had occurred with respect to withheld evidence bearing on motion to suppress proceedings, i.e., the defendants' Fourth Amendment standing, but further concluding that the district court had adequately cured the violation short of dismissal of charges); *United States v. Foster*, 874 F.2d 491, 495 (8th Cir. 1988) (noting a "prosecutor's . . . . overriding duty of candor to the court, and to seek justice rather than convictions").

[7]It is nothing short of remarkable that, at this late juncture in the ill-fated forty-year "War on Drugs," before undertaking a risky warrantless search of the Ford Explorer, Captain Roberts failed to take the time to contact his colleagues in the law enforcement community in Greensboro, North Carolina, the destination of the suspicious vehicle. For decades,

probable cause to believe it contained contraband or evidence of a crime;[8] (2) without a warrant;[9] and (3) without the consent of any person with actual or apparent authority to consent to the search.[10] Upon searching the vehicle, he discovered the

---

local, state, and federal agencies have demonstrated an admirable capacity for inter-jurisdictional cooperation. *See, e.g.*, the seminal case of *Illinois v. Gates*, 462 U.S. 213, 225–26 (1983) (describing how, in May 1978, in the course of his investigation of an anonymous tip reporting drug trafficking activity, a narcotics detective in Bloomingdale, Illinois, obtained the assistance of federal DEA agents in Miami, Florida).

The irony here is doubly striking inasmuch as it was *Gates*, in its rejection of the rigid test for probable cause determinations derived from *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), that established a "totality of the evidence" approach, and thereby rendered it far easier for law enforcement officers to obtain warrants, for which the Court has long expressed a strong preference. *See Gates*, 462 U.S. at 236 ("A magistrate's determination of probable cause should be paid great deference by reviewing courts . . . . A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant . . . .") (internal quotation marks and citations omitted); *see also Terry v. Ohio*, 392 U.S. 1, 20 (1968) ("[P]olice must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure"). Captain Roberts's dubious roll of the dice in conducting a warrantless search of the Ford Explorer in this case thus flies in the face of many decades of modern Supreme Court jurisprudence.

[8]The government has never argued that Roberts had probable cause to search the Ford Explorer.

[9]The government has never argued that a warrant was sought or obtained, and Roberts confirmed as much in his testimony. J.A. 63.

[10]Although the government made fleeting references to consent, J.A. 26, 35, it provided no support to the district court for its contention that the driver of the automobile carrier had actual or apparent authority to consent to a search of the Ford Explorer. "[N]ot all bailment situations involve giving the bailee" such control over an object that the bailor 'must be taken to have assumed the risk that [the bailee] would allow someone else to look inside.'" Wayne R. LaFave, 4 *Search & Seizure: A Treatise on the Fourth Amendment* § 8.6(a) (5th ed. 2012) (quoting *Frazier v. Cupp*, 394 U.S. 731, 740 (1969)). Notably, the record contains no evidence about the

following evidence of consequence in this case: (1) the heavy odor of "Bondo," which is "used for vehicle repairs" and "the construction of aftermarket compartments"; (2) evidence that the vehicle seats had been removed and the gas tank accessed; and, ultimately, using his fiber optic scope, (3) more than twenty bricks of cocaine, valued by Roberts at $3 million dollars, wrapped in plastic floating in the gas tank. J.A. 39–41, 47.

---

details of the bailment relationship in this case. In any event, the prosecutor's argument at the suppression hearing reflected the government's fundamental confusion over its role in this case:

> Your Honor, first regarding the vehicle, the Government has argued in its response, the Defendant, based on this evidence, has no standing to contest the search of that Ford Explorer. The car that was being transported, the shipper is listed as Wilmer Castenada. The recipient is listed as Wilmer Castenada. No information on the title or who the owner is. The phone number on the bill of lading accompanying the vehicle, several calls that Captain Roberts made, he gets no answer. So the true owner of the vehicle is not identified, and the person who shipped it and to whom it was to be shipped, doesn't live at either address.

> When he spoke to people at the addresses here in Greensboro, they didn't know a Wilmer Castenada, so the vehicle is in possession of [the driver], *so at that point, the Government would argue that [the driver] could lawfully give consent for the officer to look inside that vehicle*.

J.A. at 64-65 (emphasis added). Thus, the government's consent argument was nonsensical: namely, if Appellant lacked standing, then the driver of the transport trailer could give valid consent. But what the government seems not to understand at all is that if Appellant lacked standing, neither consent nor any other substitute for a warrant was necessary because, without an objectively reasonable expectation of privacy, Appellant had no claim of right with respect to the vehicle whatsoever. *See United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012) ("When there is no reasonable expectation of privacy, the Fourth Amendment is not implicated. A search or seizure for Fourth Amendment purposes does not occur, therefore, when a person lacks a reasonable expectation of privacy . . . .") (internal citations omitted), *petition for cert. filed* Jan. 29, 2013) (No. 12-8485).

One week after Roberts had searched and seized the vehicle, on or about September 27, 2010, after putting in place a ruse with the assistance of DAS, the vehicle transport company, Roberts finally had contact with Appellant, calling from the number 336-263-7145[11] and identifying himself by his alias, Wilmer Castenada.[12] In a phone conversation on that day, Roberts advised Appellant that he would have to arrange to retrieve the vehicle from Texas. Appellant agreed to do so and arrived in Texas sometime on or about October 1, 2010, when he and one of his coconspirators were arrested. Appellant was in possession of the title document to the Explorer and tracking information from DAS, and a cell phone using

---

[11]Interestingly, Roberts contradicted the government's assertion in its opposition to the motion to suppress by testifying that this phone number "wasn't matching the phone number that [he] had off the bill of lading." J.A. 43; *id.* at 23 (government's opposition to the motion to suppress, asserting that "[t]he telephone number listed for Castenada on the Bill of Lading was 336-263-7145").

[12]*See* J.A. 43 (Roberts's testimony that "Wilmer Castenada" had called him from 336-263-7145); *id.* at 50, 58 (Roberts's testimony that 336-263-7145 "was the same number" from which "the subject identified as . . . Wilmer Castenada" had called).

Roberts testified at the suppression hearing that Wilmer Castenada and Arturo Castellanos were one and the same:

Q   And you recognized [(336)263-7145] as being the number that the individual was . . . calling from when he was contacting you?

A.   Yes. Identified as Mr. Wilmer Castenada. That's also the same number that I believe Mr. Moore with DAS Auto Shippers had given me.

Q.   That he said belonged to Wilmer Castenada?

A.   Yes.

Q.   And that person you later determined to be Mr. Arturo Castellanos, correct?

A.   Best I can figure, yes.

J.A. 61.

the same number he had used to communicate with Roberts over the preceding several days.[13]

Meanwhile, back in Greensboro, Agent Razik had successfully uncovered the story of the undelivered Ford Explorer, when he returned to the towing business on Montlieu Avenue in Greensboro and learned that Appellant had been the man inquiring about the Ford Explorer between September 24 and September 29, 2010. J.A. 23–24. In fact, according to Roberts's hearing testimony, Agent Razik had telephoned Roberts on or about September 28, 2010, and the two conferred regarding what was now their joint investigation of the North Carolina-based drug conspiracy:

> On the 28th, I believe it was, of September, I spoke with Agent Razik . . . . He was aware of the Ford Explorer. Matter of fact, he was waiting for the Ford Explorer to arrive in North Carolina. The vehicle never showed up. Through his investigation, he was able to come to the conclusion that it had been apprehended and seized in Texas and that's where he got my name and phone number and contacted me.

---

[13]Inexplicably, the government, and the majority following the government's lead, devotes much attention to Appellant's activities in Texas and specifically his interactions with Captain Roberts after he had been arrested there. But few of those facts bear on the state of affairs at the time, one week earlier, when Roberts conducted the warrantless, nonconsensual search of the Ford Explorer. And the limited evidence having any relevance to the issue on appeal of Appellant's acts and statements in Texas cut against the government: (1) Appellant appeared with the title to the vehicle; (2) Appellant insisted (and never denied or disclaimed) he was the purchaser/owner of the vehicle; and (3) Appellant possessed the phone assigned to the number which Roberts had been using to communicate with Appellant. All of these facts were confirmed by Roberts in his hearing testimony. It wholly escapes me how this evidence cuts *against* a finding, rather than *in support* of a finding, that at the time of the search of the vehicle, Appellant harbored an objectively reasonable expectation of privacy in the vehicle.

*Id.* at 45-46. The government's response to the motion to suppress further elaborated on the cooperation between the two law enforcement officers:

> On September 28, 2010, Agent Razik spoke with Captain Kevin Roberts who confirmed that the vehicle had been seized from the DAS car carrier after 23 kilograms of cocaine were found in the gas tank. Captain Roberts advised Agent Razik that the vehicle's bill of lading stated the vehicle was being shipped from Gardenia, California, to "Wilmer Castaneda" in Greensboro, North Carolina. The telephone number listed for Castaneda on the Bill of Lading was 336-263-7145.

*Id.* at 23.

* * * * *

The sum and substance of the only rational version of the interstate narrative shown by this record, as of the time Roberts conducted his warrantless and nonconsensual search of the Ford Explorer on September 20, 2010, is that Appellant's job as a coconspirator in the charged conspiracy was to exercise joint possession, dominion, and control over the Ford Explorer and see to its safe delivery to himself, in the person of his alias, Wilmer Castenada, at 136 Montlieu Avenue, Greensboro, North Carolina.[14]

---

[14]The narrative set forth in this summary is fully described in the Factual Basis:

> During debriefings, Juan Manuel Lopez advised DEA agents that defendant CASTELLANOS and Raul Hernandez were the two men he had . . . instructed to meet in Greensboro on or about September 25, 2010, in order to take possession of a shipment of cocaine. According to Lopez, the cocaine was being shipped in a vehicle via car carrier from a source in California. The source told Lopez that CASTELLANOS and Hernandez would take pos-

## B.

On February 1, 2011, a federal grand jury in the Middle District of North Carolina indicted Castellanos and others for conspiracy to distribute five kilograms or more of a mixture or substance containing cocaine hydrochloride, in violation of 21 U.S.C. §§ 841 and 846. On April 1, 2011, he pled not guilty.

On June 3, 2011, Castellanos moved to suppress all evidence seized from the Ford Explorer, arguing that the search had violated the Fourth Amendment.[15] The government

session of the load vehicle and deliver the cocaine to Lopez. Lopez stated he took defendant CASTELLANOS to obtain a fictitious identification card. Lopez recalled that the last name on the ID card was Castaneda. Lopez advised that defendant CASTELLANOS went to a carrier business near Market Street and Montlieu Avenue in Greensboro several times between September 25 and September 29, 2010, in order to find out when the vehicle would be delivered. On September 29, 2010, CASTELLANOS was advised by a person at the Greensboro car carrier company that the vehicle was in Pecos, Texas. CASTELLANOS advised Lopez that he and Hernandez would travel to Pecos in order to retrieve the vehicle. Lopez stated that he advised CASTELLANOS not to make the trip and to take a loss on the vehicle and the load. CASTELLANOS decided to make the trip and Lopez gave CASTELLANOS and Hernandez $1,000 in cash in order to purchase airline tickets to Texas. Lopez dropped the pair off at the Raleigh-Durham airport. Lopez stated that he spoke with the California source on October 2, 2010. The source advised Lopez that the defendant and Hernandez had robbed the drug trafficking organization. During a subsequent call, the source advised Lopez that something was not right [with the shipment] and directed Lopez to get rid of the contact number Lopez had for defendant CASTELLANOS.

Factual Basis 10–12. The parties confirmed this account, as well, at the sentencing hearing. *See* Sentencing Tr. 23–25, *United States v. Castellanos*, No. 1:11–cr–00031–NCT-5 (M.D.N.C. Apr. 12, 2012), ECF No. 98.

[15]J.A. 10–13. Castellanos also moved to suppress the evidence seized from the duffel bag he took with him to Texas, *id.*, but has abandoned that claim on appeal.

argued that Castellanos had no standing to challenge the search because he had lacked any "expectation of privacy in a vehicle that was being shipped under a fictitious name to the same fictitious person at an address in Greensboro, North Carolina that [wa]s assigned to two local businesses." J.A. 26. *See also id.* at 64.

On July 6, 2011, the district court denied the motion to suppress, reaching a bare legal conclusion, unsupported by any findings of fact, that Castellanos had lacked a reasonable expectation of privacy in a vehicle that "had been given over to a common carrier with addresses which were ascertained to be false." J.A. 72.[16] On July 18, 2011, Castellanos entered a

---

[16]Curiously, although the government's written opposition to the motion to suppress relied solely on Appellant's alleged lack of standing, the transcript of the motion hearing shows that neither the government nor the district court actually called on Appellant to "prove" his standing. Specifically, this is how the motion hearing commenced:

THE COURT: Ms. Hairston.

MS. HAIRSTON: Good morning. Your Honor, we're calling United States of America versus Arturo Castellanos, case number 1:11CR31-5. Mr. Castellanos is represented by Mr. Michael Archenbronn. The case is called for hearing on the Defendant's motion to suppress.

THE COURT: Do we need an interpreter in this case?

MR. ARCHENBRONN: No, Your Honor.

THE COURT: Mr. Castellanos, would you – is Castellanos the name you prefer to be addressed by?

THE DEFENDANT: Yes, sir. That's fine with me.

THE COURT: You may be seated. Ms. Hairston, do you have evidence?

MS. HAIRSTON: Yes, sir, Your Honor. We would like to call at this time, Captain Kevin Roberts.

(CAPTAIN KEVIN ROBERTS, GOVERNMENT'S WITNESS, WAS SWORN.)

Thus, the government proceeded to introduce evidence even before it was satisfied it had to do so, because if Appellant lacked standing, there was

conditional guilty plea, *id.* at 74, reserving his right to challenge the suppression ruling, *see* Plea Agreement 4, *United States v. Castellanos*, No. 1:11-cr-00031-NCT-5 (M.D.N.C. July 13, 2011), ECF No. 66. On December 2, 2011, he was sentenced to 120 months in prison. J.A. 5, 74–75. Judgment was entered on February 3, 2012, and Castellanos filed this timely appeal on February 13, 2012. *Id.* at 5, 74.

## II.

Castellanos argues that the district court erred in denying his motion to suppress the evidence from the Ford Explorer because the government did not obtain a warrant and no "well-defined exception existed to justify the search." Appellant's Br. 13. He contends that "[p]lacing an item into the hands of a shipper . . . does not . . . diminish one's expectation of privacy in that item." *Id.* at 9.

The government counters that Castellanos had no legitimate expectation of privacy because, at the time of the search, "no facts . . . connected [him to] the Ford Explorer": "The information provided to the car carrier service was totally false," and any "subjective expectation" that the drugs would not be discovered is "not one that society is prepared to recognize as reasonable." Appellee's Br. 13 (internal quotation marks omitted).

## III.

A proper determination of standing requires careful consideration of all the evidence, regardless of which party, the government or the defendant, introduces the evidence. Moreover, the evidence must be considered from a wholly objective per-

---

no need for the government to introduce any evidence at all. *See Illinois v. Andreas*, 463 U.S. 765, 771 (1983) ("If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no 'search' . . . .").

spective, without regard for the state of mind of the searching government agent. Finally, neither the use of an alias nor the transfer of possession of constitutionally protected effects for transport by a common carrier vitiates an objectively reasonable expectation of privacy in connection with that property.

A.

"It is axiomatic that 'suppression of the product of a Fourth Amendment violation can be successfully urged *only* by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence.'" *United States v. Gray*, 491 F.3d 138, 144 (4th Cir. 2007) (emphasis in original) (quoting *Alderman v. United States*, 394 U.S. 165, 171–72 (1969)). "Thus, the 'capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in the invaded place.'" *Id.* (ellipses in original) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978))). "To be legitimate, an expectation of privacy must be objectively reasonable: it must flow from 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Id.* at 145 (quoting *Carter*, 525 U.S. at 88).

Notably, the Fourth Amendment "does not shield only those who have title to the searched premises." *Mancusi v. DeForte*, 392 U.S. 364, 367 (1968). Indeed, "[a] person may have a legitimate expectation of privacy in a place or object he does not own." *United States v. Perez*, 689 F.2d 1336, 1338 (9th Cir. 1982) (per curiam) (citing *United States v. Reyes*, 595 F.2d 275, 278 (5th Cir. 1979)). "What is a reasonable expectation of privacy is by definition related to time, place and circumstance." *United States v. Ramapuram*, 632 F.2d 1149, 1154 (4th Cir. 1980). Thus, in determining whether a person has a reasonable expectation of privacy in

a particular place or object, courts consider the totality of the circumstances, *Gray*, 491 F.3d at 151, taking into account "whether [the] person claims an ownership or possessory interest in the property," *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992); the individual's "control of the area searched," *United States v. Horowitz*, 806 F.2d 1222, 1225 (4th Cir. 1986); "his efforts to ensure [his] privacy" in the object or area, *id.*; "the purposes for which the individual uses the property," *United States v. Stevenson*, 396 F.3d 538, 546 (4th Cir. 2005); his "historical use of the property," *United States v. Sanchez*, 943 F.2d 110, 113 (1st Cir. 1991); and "society's common understanding as to areas that deserve Fourth Amendment protection," *Stevenson*, 396 F.3d at 546. "Any determination of the reasonableness of an individual's expectation of privacy is necessarily fact intensive," *United States v. Smith*, 978 F.2d 171, 180 (5th Cir. 1992), and "custom and contemporary norms necessarily play . . . a large role in the constitutional analysis," *Payton v. New York*, 445 U.S. 573, 600 (1980).

The defendant bears the burden of proving standing to challenge a search under the Fourth Amendment. *Stevenson*, 396 F.3d at 547. Nonetheless, the defendant need not affirmatively present evidence of his legitimate expectation of privacy; rather, he may simply "point to specific evidence in the record which the government [has] presented and which establishe[s] his standing." *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995).[17] A mere preponderance of the evidence will

---

[17]*Accord United States v. Gates*, 745 F. Supp. 2d 936, 948 n.4 (N.D. Cal. 2010) ("[A] defendant may establish standing by pointing to all evidence in the record, including the Government's evidence."); *United States v. Doe*, 801 F. Supp. 1562, 1573 (E.D. Tex. 1992) (finding that defendant established a legitimate expectation of privacy in a car through "testimony by a government witness from which it [wa]s reasonable to infer that defendant's possession of the vehicle was lawful and with permission"); 6 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 11.2(b) (5th ed. 2012) ("[I]t may happen that the burden is actually met . . . by evidence given by the [government]."), cit-

suffice. *United States v. Vega*, 221 F.3d 789, 795 (5th Cir. 2000), *abrogated on other grounds as recognized by United States v. Aguirre*, 664 F.3d 606, 611 n.13 (5th Cir. 2011). *Accord United States v. Helms*, 703 F.2d 759, 763–64 (4th Cir. 1983) (noting that "any . . . fact at a suppression hearing" must be "established only by a preponderance of the evidence").

B.

Because, as the majority recognizes, a reasonable expectation of privacy exists where the defendant has a subjective expectation that is objectively reasonable, *ante* 7, Castellanos is the only person whose state of mind is relevant. Nonetheless, the majority focuses its attention on how the facts appeared to Captain Roberts at the time of the search. In so doing, the majority misapplies longstanding Fourth Amendment principles and reaches the wrong result.

Simply put, in a case like this, the "state of mind of the searcher regarding the possession or ownership of the item searched is irrelevant to the issue of standing." *United States v. Han*, 74 F.3d 537, 545 (4th Cir. 1996) (quoting *United States v. Canada*, 527 F.2d 1374, 1378 (9th Cir. 1975)). *See also United States v. Paradis*, 351 F.3d 21, 32 (1st Cir. 2003) ("[A] protectible [Fourth Amendment] interest . . . does not

---

ing *People v. Gonzalez*, 502 N.E.2d 1001, 1002 (N.Y. 1986) ("[E]vidence elicited during the People's direct case may be cited in support of a defendant's standing claim.") (internal citation omitted); 1 John Wesley Hall, Jr., *Search & Seizure* § 6.3 (LexisNexis 2012) ("It is conceivable that the defense could show [standing] through prosecution witnesses and that it could be self-evident in many circumstances."), citing *People v. Fuentes-Borda*, 589 N.Y.S.2d 5, 6 (N.Y. App. Div. 1992) (holding that defendant had standing to challenge police invasion of apartment because, although defendant had not asserted "personal standing," "the police observations of defendant and his companion entering, exiting and locking the apartment established a privacy interest sufficient to confer standing").

depend on the state of mind of the police at the time of the seizure."). Rather, it is "the omniscient perspective—what a judge considering a motion to suppress knows, ex post reality—that drives standing doctrine." 6 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 11.3 (5th ed. 2012) (quoting Sherry F. Colb, *Standing Room Only: Why Fourth Amendment Exclusion and Standing Can No Longer Logically Coexist*, 28 Cardozo L. Rev. 1663, 1671 (2007)).

The results of Roberts's inquiries about the Ford Explorer are relevant only insofar as they provide *objective* evidence of who had an "ownership or possessory interest" in the vehicle, *Rusher*, 966 F.2d at 875, or who had control of it, *Horowitz*, 806 F.2d at 1225. Such evidence is limited to Roberts's discovery that the shipping documents identified the owner as Wilmer Castenada, and the officer's subsequent discovery that Wilmer Castenada was Appellant's alias. *See supra* n.12. That Roberts *subjectively* thought that the bill of lading listed a false address for delivery is irrelevant; as shown above, the government's own filings indicated that a Montlieu Avenue towing business was expecting delivery of the Ford Explorer. *See supra* n.6. Indeed, Roberts himself testified that "Bobby's Towing . . . in Greensboro" was where the vehicle was "possibly destine[d]." *Id.* The officer further testified that Appellant had called the shipping company several times to inquire about the Ford Explorer, and had arrived in Texas—to retrieve the vehicle—with the title document to the Explorer, tracking information from DAS, and a cell phone using the same number he had used to communicate with Roberts over the preceding several days.

In sum, the objective evidence adduced at the suppression hearing demonstrated that Wilmer Castenada was Appellant's alias, Wilmer Castenada was listed on the bill of lading for the Ford Explorer, Appellant had the title and shipment tracking information for the vehicle, he had called several times to check on the status of the Explorer, he had the cell phone

from which he had made those calls, and a towing company in Greensboro had been expecting the vehicle's delivery. The court also knew, from the government's opposition to the motion to suppress, that Appellant had visited the Greensboro towing business several times to ask about the Ford Explorer. These undisputed facts were more than sufficient to establish, by a preponderance of the evidence, that Appellant had an objectively reasonable protectable Fourth Amendment interest in the Explorer and, in particular, in the privacy afforded by its gas tank.

## C.

That Appellant used an alias does not defeat his objectively reasonable expectation of privacy. Although we have held that an individual who is not the sender does not have a legitimate expectation of privacy in a mailing addressed to a third party,[18] the use of an alias alone does not foreclose the right to assert a Fourth Amendment claim. The distinction between the use of a third party as an addressee, and the use of an alias disguising the true identity of the addressee, cannot be overstated. An individual who is not the sender cannot assert an expectation of privacy in a mailing addressed to an actual third party because the privacy right, and thus any Fourth Amendment challenge, belongs to that third party. In contrast, where, as here, the individual asserting the expectation of pri-

---

[18]*See United States v. Givens*, 733 F.2d 339, 341-42 (4th Cir. 1984) (per curiam) (finding defendants lacked a legitimate expectation of privacy in the contents of a package addressed "neither to them nor to some entity, real or fictitious, which is their *alter ego*, but to actual third parties," and specifically reserving opinion on whether a legitimate expectation of privacy can exist in a package addressed to a fictitious entity created by the defendants). *See also United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994) (holding a defendant lacked a legitimate expectation of privacy in a letter addressed to, and opened by, a third party); *United States v. Koenig*, 856 F.2d 843, 846 (7th Cir. 1988) (finding a defendant who was "neither the sender nor the addressee of the package" had no privacy right in it, and thus lacked standing).

vacy is in fact the addressee but has disguised his true identity by using an alias, he retains an expectation of privacy in the object, and the right to bring a Fourth Amendment challenge to the search or seizure of that object.

Despite the majority's unwillingness to follow this principle, a number of courts have already done so. *See United States v. Villarreal*, 963 F.2d 770, 774 (5th Cir. 1992) (holding that "individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names"); *United States v. Johnson*, 584 F.3d 995, 1002 (10th Cir. 2009) ("there is a fundamental difference between merely using an alias to receive a package and using another's identity"); *United States v. Colon-Solis*, 508 F. Supp. 2d 186 (D. P.R. 2007) ("It is generally accepted that individuals may assert a reasonable expectation of privacy in packages addressed to them under fictitious names") (citing *United States v. Goldsmith*, 432 F. Supp. 2d 161, 170 (D. Mass. 2006), and *Villarreal*, 963 F.2d at 774)).

As the Seventh Circuit's opinion in *United States v. Pitts* reminds us, "there is nothing inherently wrong with a desire to remain anonymous when sending or receiving a package." 322 F.3d 449, 459 (7th Cir. 2003). Although a "law enforcement officer or a court is certainly entitled to consider the use of an alias as a relevant factor in deciding whether to detain mail . . . or issue a warrant," the use of an alias alone should not result in a loss of Fourth Amendment rights. *Id.* at 459 n.1. To hold otherwise significantly weakens Fourth Amendment protections, because the existence of a legitimate expectation of privacy "does not depend on the nature of the defendant's activities, whether innocent or criminal." *Id.* at 458 (citing *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997)). Thus, Appellant's use of the alias Wilmer Castenada did not defeat his legitimate expectation of privacy in the Ford Explorer.[19]

---

[19]The majority's observation that Appellant "maintained that Castenada was a different person" is of little import. *Ante* p.5. Appellant made such

## D.

Similarly, Appellant did not lose his privacy interest in the Explorer simply because an automobile transport service had physical possession of the vehicle. The mere fact of turning over an item—be it a letter, a package, or a vehicle—to a common carrier does not extinguish one's objectively reasonable expectation of privacy in the item. It has long been held that letters and packages sent through the mail are accorded full Fourth Amendment protection. *See United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy; warrantless searches of such effects are presumptively unreasonable.") (footnote omitted).

This Court has observed, "Sealed packages are, of course, entitled to Fourth Amendment protection against warrantless searches and seizures, just as any other private area." *United States v. Givens*, 733 F.2d 339, 341 (4th Cir. 1984) (per curiam). The legitimate expectation of privacy in packages sent through the mail and common carriers extends to both senders and recipients. *See id.*; *Villarreal*, 963 F.2d at 774. Ordinarily, the sender's expectation of privacy terminates upon delivery. *United States v. King*, 55 F.3d 1193, 1196 (6th Cir. 1995).

There is no reason why a vehicle sent through a car delivery service would be entitled to any lesser expectation of privacy than, say, a package sent via the U.S. Postal Service. Just

---

assertions only after he had been arrested on October 1, 2010, and *long after his objectively reasonable expectation of privacy in the Explorer had been subjected to a governmental intrusion* on September 20, 2010. "[I]t is difficult to understand how a refusal to make incriminating admissions in response to police interrogation can be held to deprive a person of Fourth Amendment standing." 6 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 11.3(e) (5th ed. 2012).

as there is no expectation of privacy in the address on a package, *see United States v. Hinton*, 222 F.3d 664, 675 (9th Cir. 2000), one has no reasonable expectation of privacy in the exterior of a vehicle or respecting objects in a vehicle that are observed from outside it, *see Texas v. Brown*, 460 U.S. 730, 740 (1983). But, once placed within a closed container, "a diary and a dishpan are equally protected by the Fourth Amendment." *Robbins v. California*, 453 U.S. 420, 426 (1981) (plurality opinion), *abrogated on other grounds*, *California v. Acevedo*, 500 U.S. 565 (1991).

It cannot seriously be argued that a vehicle gas tank is anything other than a closed container. *Cf. United States v. Urbina*, 431 F.3d 305, 310 (8th Cir. 2005) ("The sound of objects moving in the tank gave the officers probable cause to believe that the gas tank contained contraband, and probable cause is sufficient to justify the warrantless search of an automobile or a container therein, including the destruction, if necessary, of the container."). It therefore carries with it a reasonable expectation of privacy, protected by the Fourth Amendment, and cannot be searched absent a warrant or probable cause. As the recipient (if not the sender) of the vehicle, Appellant—using the alias Wilmer Castenada—had a reasonable expectation of privacy in the areas of the vehicle not observable by one looking into the interior of the vehicle from outside. *See Robbins*, 453 U.S. at 426.[20]

---

[20]Contrary to the majority's subliminal suggestions, which appear throughout its analysis, nothing in the record supports the view that the Ford Explorer had been abandoned at the time Roberts searched it on September 20, 2010. As noted earlier, *see supra* n.6, the bill of lading listed a Montlieu Avenue address as the vehicle's destination, and a towing company on that street was expecting its delivery, for further delivery to Appellant. Indeed, Roberts testified to this at the suppression hearing. *Id.* At worst, then, the bill of lading contained a typo in the delivery address, not a "false" address.

Inexplicably, despite the abundant undisputed evidence in the record, which includes a photo identification made by an employee of the Mont-

E.

Considering the totality of the circumstances in this case, Appellant had a reasonable expectation of privacy sufficient to maintain his Fourth Amendment challenge to the warrantless search of the Ford Explorer and its gas tank. Appellant used the alias Wilmer Castenada, Wilmer Castenada was listed on the bill of lading for the Ford Explorer, Appellant had the title and shipment tracking information for the vehicle, he called several times to check on the status of the Explorer, and he had the cell phone from which he had made those calls when he was arrested. Whether or not he was the actual owner, Appellant had a right to possession, coupled with constructive dominion and control over the vehicle at the time Roberts searched it, such that, as a matter of law, he enjoyed an objectively reasonable expectation of privacy in the vehicle. The district court's contrary finding and conclusion was clearly erroneous as a matter of fact and legally erroneous, as well.[21]

---

lieu Avenue towing company where the drug-laden Ford was to be delivered, that it was indeed Appellant who repeatedly appeared (as "Wilmer") between September 24 and 26, 2010, to take delivery of the vehicle, the majority (purporting to "grant[ ] Castellanos the benefit of the doubt," *ante* at 12) seems to reject that undisputed fact. It is not clear to me how an appellate court can question or ignore such undisputed material facts in the record, *facts to which the parties have stipulated in support of a guilty plea*.

[21]The majority's assertion that "the argument made by the dissent appears *sua sponte* for the first [time] in the dissent, having never been presented by Castellanos in the trial court or on appeal," *ante* at n.4, is downright puzzling. As previously mentioned, the sole basis for the district court's denial of the motion to suppress was its reliance on *United States v. Crowder*, 588 F.3d 929, 934–35 (7th Cir. 2009), for the proposition that Appellant lacked a "legitimate expectation of privacy at [the] point [when the Ford Explorer] had been given over to a common carrier with addresses which were ascertained to be false addresses." *See* J.A. 72; *see supra* n.3. In his brief on appeal, Appellant took direct aim at that legal conclusion, identifying the issue on appeal as follows:

## IV.

For the reasons set forth herein, I would vacate the judgment, reverse the order of the district court ruling that Appellant lacked an objectively reasonable expectation of privacy in the Ford Explorer on September 20, 2010, and remand this case for further proceedings.

---

DID THE DISTRICT COURT COMMIT ERROR BY DENYING APPELLANT[ ]'S MOTION TO SUPPRESS THE EVIDENCE FOUND IN THE FORD EXPLORER WHEN IT HELD THAT APPELLANT HAD NO LEGITIMATE EXPECTATION OF PRIVACY IN THE FORD EXPLORER SINCE IT WAS BEING SHIPPED BY A COMMON CARRIER?

Appellant's Br. 2. Thus, it is the majority, not Appellant or this dissent, that has fundamentally altered the legal landscape on which the case has been litigated in the course of this appeal. In any event, as Justice Marshall instructed the courts of appeals twenty-five years ago:

> When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991). *Cf. Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1346 (Fed. Cir. 2001) (noting "the familiar principle that [an appellate court] does not review supporting arguments, but only the decisions reached by the trial court"); *Lawlor v. Nat'l Screening Serv. Corp.*, 352 U.S. 992, 994 (1957) (per curiam) (Frankfurter, J., dissenting) ("We review judgments not talk.").